# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-692


STATE OF LOUISIANA

VERSUS

DWANE EDWARD FOX


**********


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7277-13
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE


**********


## MARC T. AMY
## JUDGE


**********


Court composed of Marc T. Amy, Billy Howard Ezell, and David Kent Savoie, Judges.


**AFFIRMED WITH INSTRUCTIONS.**

**John F. DeRosier**
**District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**Christy Rhoades May**
**Assistant District Attorney**
**Bobby L. Holmes**
**Assistant District Attorney**
**Post Office Box 3206**
**Lake Charles, LA   70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, LA   70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Dwane Edward Fox**

**Dwane Edward Fox**
**Allen Correctional Center**
**3751 Lauderdale Woodyard Road**
**Kinder, LA   70648**
**IN PROPER PERSON**

**AMY, Judge.**

The defendant was charged with second degree murder in connection with the death of Mychel Cleaver. A jury found the defendant guilty of manslaughter, and the trial court sentenced the defendant to forty years at hard labor with credit for time served. The defendant appeals. For the following reasons, we affirm, with instructions.

### Factual and Procedural Background

The body of the victim, Mychel Cleaver,[1] was discovered in a ditch outside Lake Charles, Louisiana in January of 2012. Dwane Edward Fox, Mychel's "on-again, off-again" boyfriend and the defendant herein, was identified as a suspect. Thereafter, the defendant claimed that Mychel had attacked him. The defendant admitted that he knocked Mychel to the floor, choked her when she was not moving, and thereafter disposed of her body and belongings. The State charged the defendant with second degree murder, a violation of La.R.S. 14:30.1. A jury subsequently found the defendant guilty of the responsive verdict of manslaughter, a violation of La.R.S. 14:31. The trial court sentenced the defendant to forty years at hard labor with credit for time served.

The defendant appeals, asserting as error that:

> I. The State failed to prove beyond a reasonable doubt that the killing was not justified to prevent either great bodily harm or death to Appellant, Dwane Fox.

> II. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)[,] standard, was insufficient to prove beyond a reasonable doubt the specific intent element of either manslaughter or the original charge of second degree murder.

---

[1] The victim's name is also spelled as "Mychele" in the record; we use the spelling on the death certificate.

III. The trial court failed to consider the applicable factors set forth in La. Code Crim. P. art. 894.1, and considered factors not supported by the record.

IV. The maximum sentence of forty years at hard labor imposed upon Dwane Fox is excessive and is a violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution.

## Discussion

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920, all criminal appeals are reviewed for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La.Code Crim.P. art. 920(2). Our review of the record reveals one such error. Namely, the transcript of the sentencing hearing does not indicate that the trial court advised the defendant of the prescriptive period for post-conviction relief as required by La.Code Crim.P. art. 930.8. Accordingly, we direct the trial court to advise the defendant of the provisions of Article 930.8 by sending appropriate written notice to him within ten days of the date of the rendition of this opinion and to file written proof in the record that the defendant received the notice. *See State v. Malbrough*, 11-1241 (La.App. 3 Cir. 6/20/12), 94 So.3d 933.

*Sufficiency of the Evidence*

The defendant's first two assignments of error concern the sufficiency of the evidence. Specifically, the defendant contends that the State failed to disprove his assertion of self-defense and that the State failed to establish that the defendant possessed the necessary intent to kill required for second degree murder or manslaughter. When a defendant raises multiple assignments of error including sufficiency of the evidence, the reviewing court should first address the sufficiency

2

of the evidence.  *State v. Hearold*, 603 So.2d 731 (La.1992).  In *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86, the supreme court reiterated the standard of review for sufficiency of the evidence claims on appeal, stating:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses.  *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35.   A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review.  *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20.  It is not the function of an appellate court to assess credibility or re-weigh the evidence.  *Id*.

Although initially charged with second degree murder, the defendant was convicted of the lesser charge of manslaughter.  As relevant herein, manslaughter is defined in La.R.S. 14:31(A) as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

> (2) A homicide committed, without any intent to cause death or great bodily harm.

Second degree murder is defined, in pertinent part, as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A).

3

Additionally, the defendant asserted at trial that he was acting in self-defense. Louisiana Revised Statutes 14:20 provides, in pertinent part, that a homicide is justifiable when "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant in a homicide case claims self-defense, the State must establish beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Perkins*, 527 So.2d 48 (La.App. 3 Cir. 1988). "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La. 11/16/15), __ So.3d __. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

The evidence presented at trial was that on January 10, 2013, several passersby discovered a body in a ditch near Lake Charles, Louisiana, which was later identified as Mychel Cleaver. Dr. Terry Welke, who was accepted as an expert in forensic pathology, testified that he performed an autopsy on Mychel's body and that he determined that the death was a homicide. Dr. Welke's testimony was that Mychel's death was caused by blunt force injuries of the head and

asphyxia. He later testified that he attributed her death "more so" to the asphyxia. He also estimated that Mychel died in the evening of January 9 or in the early hours of January 10, but was unable to give an exact time.

Dr. Welke testified as to a variety of bruises, lacerations, and abrasions on Mychel's body. These injuries included a "pattern injury" on her face, which was caused by something having a texture being pushed into her skin; a perforation caused by her tooth poking a hole in her lip from "either been shoved into . . . from a hit or something of that sort[;]" bruising and swelling on her hands and arms which were consistent with defense wounds; and a laceration above her eye that appeared to be older because there was evidence of stitches. Dr. Welke also noted that he observed "little tiny . . . pinpoint bruises," or petechiae, under the surface of both eyelids. According to Dr. Welke, petechiae "helps us to tell whether someone has died from asphyxia. Asphyxia means no oxygen, so that means we can see it in people that have died as a result of strangulation, suffocation, hanging, things of that sort." Dr. Welke opined that he thought that the asphyxia was caused by something covering Mychel's nose and mouth area, but that manual strangulation would be a possibility.

Dr. Welke also testified that Mychel's toxicology results indicated positive results for THC (a product of marijuana), alcohol, and caffeine. According to Dr. Welke, Mychel's blood alcohol content was two-and-half times the legal limit. Further, Mychel's toxicology results were positive for several prescription drugs, including trazodone, Vistaril, and breakdown products of Tegretol and Prozac.[2] Upon questioning by the defense, Dr. Welke stated that it was a "possibility" that

---

[2] Dr. Welke indicated that Tegretol is used to treat seizures and depression; that Prozac is used to treat depression; that trazodone is used to treat depression; and that Vistaril is used to treat anxiety, nausea, vomiting, and for sedation.

certain drugs could cause respiratory levels leading to petechiae, but, with regard to the substances discovered in Mychel's toxicology results, "in the levels that came back that were in her body at the time of death, no."

There was also testimony indicating that the police contacted Mychel's sister, Lisa Lavergne, who informed them that Mychel had been with her boyfriend, the defendant. According to Ms. Lavergne, sometime after noon on January 9, Mychel came home, loaded her dog and its puppies up in a box and put them in the defendant's car. Ms. Lavergne also testified that the defendant called their home on January 10, apparently looking for the victim. Ms. Lavergne testified that Mychel lived in a cabin behind their mother's house, but had previously lived in the "tent city," which was a community for homeless people.

Detective Brent Young with the Calcasieu Parish Sheriff's Office testified that he contacted the defendant and that the defendant provided a statement. Detective Young testified that in his first statement—a video of which was played for the jury—the defendant claimed that "he had—had picked [Mychel] up on the afternoon of the 9th; they had gone to a local eatery, had gotten some sandwiches, had gone back to their house. During that time, she was not allowed to stay at the home in which [sic] he had driven her to a campsite located off Mount Talbot Drive in Lake Charles." Detective Young also testified that the defendant told the detectives that Mychel had "taken all of her things, including her pets, with her." Detective Young also testified that the defendant denied that there had been a physical argument between him and Mychel.

Further, Detective Young testified that they had the defendant take them out to the "tent city," and that a few deputies walked into the wooded area. However, according to Detective Young, the area was surrounded by water because of the

6

recent rains and, although there was evidence of people living there, there was no one there at that time. Thereafter, the police obtained permission to search the defendant's house and vehicle. The State offered testimony from several officers who collected evidence from those locations.

According to Detective Young, after the forensics technicians informed him that "possible blood" had been found during the search, the defendant agreed to speak with him again. Detective Young testified that the defendant claimed he did not know whose blood was in his house and vehicle, denied that it was Mychel's blood, and continued to claim that there had been no altercation between the two of them. A recording of the defendant's second statement to the police was played for the jury.

However, Detective Young testified that the defendant later changed his account and said that there was an altercation. Detective Young's testimony was that "[the defendant] said, 'She came at me. She came at me and was swinging her arms at me, and I guess just came up from sleep and having some alcohol in me and from there, it got worse.'" Detective Young also testified that the defendant stated that "[h]e went to the living room, and he used his fist to hit her, and that Mychel Cle[a]ver had fallen and she wouldn't move." According to Detective Young's testimony, when he confronted the defendant about Mychel having petechiae, the defendant admitted that "she was still alive when she fell and that he choked her" with his hands. Detective Young further testified that the defendant also admitted that he put Mychel's body in his car, drove around for an hour, or possibly longer, and then discarded the body. Additionally, Detective Young testified that the defendant admitted that he discarded Mychel's belongings near his work site in Westlake.

7

There was testimony that the police collected evidence including items belonging to Mychel from that location. Further, there was testimony that the police retrieved various data from the defendant's cellular phones. Detective Young testified about the contents of that data, which indicated viewing of various online advertisements in Lake Charles, Cincinnati, and Los Angeles, and media reports about the discovery of Mychel's body. Detective Young considered the advertisements as possible locations to flee.[3]

There was testimony from several witnesses about various altercations that Mychel was involved in. Ms. Lavergne testified that Mychel got in an argument with Ms. Lavergne's son the day after Christmas. According to Ms. Lavergne's testimony, she and their mother were trying to calm Mychel down and Mychel punched Ms. Lavergne and knocked her down. Ms. Lavergne testified that after she fell, she grabbed a statue and threw it at Mychel, and it "caught her above her eye, and it busted her eye open, and she ended up having to have stitches." According to Ms. Lavergne, she was arrested in connection with this incident. Further, Ms. Lavergne testified that this was not the first physical fight that she had had with Mychel.

Jeal Fazzio, a coworker of the defendant's at Alfred Palma Construction, testified that in September of 2012, the defendant came to work with injuries to his face and ear. Mr. Fazzio, the company safety officer, inquired about the source of the injuries to make sure they were not work related and took photographs.

---

[3] Additionally, the State played for the jury two recordings of phone calls between the defendant and his wife, Sheila Fox. The defendant was incarcerated, and the phone calls were recorded by the jail telephone system.

According to Mr. Fazzio's testimony, the defendant told him that Mychel and her boyfriend "came by his house and beat him up."

Donald Henry testified that he lived with Mychel for approximately three months and that they were both using crack cocaine at that time. According to Mr. Henry, Mychel had been diagnosed with multiple personality disorder and was taking medication for that diagnosis. Mr. Henry testified that one of those personalities, "Mikey," was the "protector" personality and that "Mikey" was "an angry child, and it didn't take much to set him off and make him angry. Now, when he was angry, he might pull a knife on you." Mr. Henry also stated that when Mychel was "Mikey," she would leave the house and come back "beat up" because "Mikey" would "challenge anybody." Mr. Henry also testified that "Mikey" had gotten in multiple fights, specifically noting a fight with one of Mr. Henry's girlfriends and one involving a mutual friend over a lawnmower.

Michael Mott testified about an incident he witnessed in a mobile home park involving Mychel and her nephew. According to Mr. Mott, he was inside his residence and heard Mychel yelling at her nephew, who had physical disabilities that required him to use a wheelchair. Mr. Mott testified that Mychel had been walking up and down the street and "yelling and cussing" at another visitor. According to Mr. Mott's testimony, the nephew asked Mychel to calm down. Mr. Mott stated that Mychel then walked over to the nephew, who was not in his wheelchair at the time and could not defend himself, and that she started threatening her nephew, grabbed his arm, and took his cell phone away. Additionally, Mr. Mott testified that Mychel later returned to the trailer park and was threatening other residents.

Having reviewed this evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence for a rational trier of fact to reject the defendant's assertion of self-defense and to find beyond a reasonable doubt that the defendant was guilty of manslaughter. The evidence presented at trial indicates that Mychel was the aggressor in the conflict that ultimately led to her death. Further, it is clear that the defendant was aware that Mychel had been involved in several aggressive incidents and violent conflicts before this one. However, the defendant admitted that he hit Mychel and that she fell to the floor and was not moving before he began choking her. Thus, there is sufficient evidence that a rational trier of fact could have concluded that Mychel was no longer a threat after she became unconscious. Of particular note is the fact that Dr. Welke attributed Mychel's death to blunt force trauma and asphyxia, and in fact considered it due "more so" to the asphyxia. A rational trier of fact could therefore consider the defendant's actions in choking Mychel after she became unconscious as a disproportionate use of force that went beyond self-defense. *See Mayes*, 154 So.3d 1257. Additionally, the State offered evidence that tended to prove that the defendant attempted to conceal Mychel's death by hiding the evidence; that he did not tell anyone about the altercation between himself and Mychel and in fact called Mychel's sister and inquired about her whereabouts while knowing that she was dead; and lied to the police repeatedly about his involvement in Mychel's death. *See State v. Sprinkle*, 01-137 (La.App. 1 Cir. 10/17/01), 801 So.2d 1131, *writ denied*, 01-3062 (La. 10/25/02), 827 So.2d 1174, *cert. denied*, 123 S.Ct. 1358, 537 U.S. 1235 (2003). "Fabrication is evidence of consciousness of guilt, not self-defense." *State v. Russell*, 42,479, p. 9 (La.App. 2 Cir. 9/26/07), 966 So.2d 154, 162, *writ denied*, 07-2069 (La. 3/7/08), 977 So.2d 897. Similarly, concealment of

evidence is indicative of guilty knowledge. *Id.* Accordingly, we conclude that the State offered sufficient evidence to disprove the defendant's assertion of self-defense.

The defendant also asserts that the State failed to establish that he had the specific intent to kill or inflict great bodily harm. As detailed previously, the State offered the defendant's own admission that he manually strangled Mychel after knocking her unconscious. "The act of choking another person has been repeatedly recognized as indicative of a specific intent to kill." *State v. Guillory*, 10-1175, pp. 12-13 (La.App. 3 Cir. 4/6/11), 61 So.3d 801, 809. Accordingly, a rational trier of fact could have concluded that the defendant's actions in knocking Mychel unconscious and then choking her until she died to be sufficient to conclude that the defendant had the specific intent to kill or inflict great bodily injury.

Thus, we conclude that a rational trier of fact could have concluded that the State proved beyond a reasonable doubt the elements of the responsive verdict of manslaughter with regard to the death of Mychel Cleaver. Accordingly, we find no merit to the defendant's assignments of error with regard to the sufficiency of the evidence.

*Sentencing*

The defendant also assigns error to the trial court's imposition of sentence, contending that the trial court erred in failing to adequately consider the sentencing factors contained in La.Code Crim.P. art. 894.1 and that his sentence is unconstitutionally excessive.

As an initial matter, we note that although the defendant filed both a counseled and pro se motion to reconsider sentence, neither of those motions raised

11

any grounds for reconsideration other than the bare assertion that his sentence was excessive. We conclude that, pursuant to *State v. Mims*, 619 So.2d 1059 (La.1993), this is insufficient to satisfy the requirements of La.Code Crim.P. art. 881.1(E). Accordingly, we decline to consider the defendant's assignment of error concerning the trial court's consideration of the sentencing factors contained in La.Code Crim.P. art. 894.1, and conclude that the defendant is limited to a bare excessiveness review of his sentencing claims. *Mims*, 619 So.2d 1059.

The law concerning appellate review of excessive sentencing claims is well-settled. In *State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261 (alteration in original), a panel of this court reiterated the standards for appellate review of excessive sentencing claims, stating:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> > La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957,

> *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183.

However, although sentences for similar crimes may be of some use, the reviewing court should keep in mind that it is well-settled that sentences must be individualized to the particular offender and the particular offense committed. *State v. Smith*, 02-719 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061. Similarly, as the trial court is "in the best position to assess the aggravating and mitigating circumstances presented by each case," it is within the trial court's purview to particularize each sentence. *Id.* at 739. As a general rule, maximum sentences are appropriate for the most serious violations and the worst type of offender. *Russell*, 966 So.2d 154.

The defendant herein was indicted for second degree murder, a violation of La.R.S. 14:30.1. That statute provides that "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La.R.S. 14:30.1(B). However, the defendant was convicted of the lesser offense of manslaughter, a violation of La.R.S. 14:31. As relevant herein, the sentencing provisions of La.R.S. 14:31 provide that "[w]hoever commits manslaughter shall be imprisoned at hard labor for not more than forty years."

The defendant was sentenced to forty years at hard labor, the maximum sentence for manslaughter. Given the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes, we find

that the trial court did not abuse its discretion in imposing the maximum sentence. Although the jury may have found that the crime occurred during an altercation that was instigated by the victim, the defendant first knocked the victim unconscious and then choked her until she died. The defendant then attempted to conceal his responsibility for her death by disposing of the victim's body and other evidence, feigning ignorance of the victim's whereabouts, and lying to the police about his involvement.

The record indicates that the defendant was in his mid-to-late forties, was married and has one child, and was gainfully employed at the time of the offense. Further, the defendant had multiple misdemeanor convictions and a prior felony conviction, along with arrests for domestic violence and multiple batteries.

A review of comparative cases reveals that the maximum sentence has been imposed for similar cases and offenders. In *Russell*, 966 So.2d 154, the defendant was charged with second degree murder after he shot his stepfather twice, killing him, and then buried his body in a shallow grave. Although the defendant claimed self-defense, the jury rejected that contention and found the defendant guilty of the lesser charge of manslaughter. *Id.* The second circuit upheld that sentence, noting that the trial court's remarks suggested that "the trial court believed that defendant received great lenience from the jury by being convicted of the lesser crime of manslaughter instead of the crime charged, second degree murder." *Id.* at 168.

In *State v. Lanieu*, 98-1260 (La.App. 1 Cir. 4/1/99), 734 So.2d 89, *writ denied*, 99-1259 (La. 10/8/99), 750 So.2d 962, the defendant was also charged with second degree murder after shooting the victim twice during an argument between the two men. The defendant claimed that the victim appeared to be reaching for a gun when the defendant fired the first shot. *Id.* However, the jury found the

defendant guilty of manslaughter and the trial court imposed sentence of forty years at hard labor. *Id.* The first circuit affirmed that sentence, noting that:

> after the defendant and the victim had argued and cursed at each other, the defendant reached into the victim's car, pointed his gun through the passenger side window and shot the victim, the driver of the car, twice in the head. . . . Additionally, at least one witness testified that there was a pause of one to three minutes between the first and second gunshot. After the shooting, the defendant left the crime scene in the victim's vehicle with the victim's body in the vehicle. He subsequently dumped the body in a field. According to the officer who eventually stopped and arrested the defendant, when he pursued the defendant and turned on his police lights and siren, the defendant fled at a high rate of speed. Additionally, we note that the defendant received a benefit when the jury chose to convict him of the lesser crime of manslaughter as the facts of this case were sufficient to convict him of the charged offense of second degree murder.

*Id.* at 98.

Although the defendant's arrests and convictions primarily occurred many years before this offense, it was still within the trial court's discretion to consider the defendant's history in this regard, and the trial court noted that the defendant's criminal history was "troubling." Further, the trial court commented that the defendant received the benefit of being convicted for the lesser offense of manslaughter, which has a significantly reduced sentencing exposure than the original charge of second degree murder. The trial court additionally noted that the defendant asserted in the pre-trial investigation that he continued to believe that the victim died not as a result of his actions but from a drug overdose, which the trial court found "bizarre" and an indication that the defendant did not feel remorse for his actions.

Thus, having reviewed the record and the sentences imposed in similar offenses, we conclude that the defendant's sentence is not constitutionally

excessive and that the trial court did not abuse its discretion. The defendant's assignments of error concerning his sentence are without merit.

## DECREE

For the foregoing reasons, we affirm the conviction and sentence for manslaughter of the defendant, Dwane Edward Fox. The trial court is directed to advise the defendant of the provisions of La.Code Crim.P. art 930.8 by sending appropriate written notice to him within ten days of the date of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**