STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-72

STATE OF LOUISIANA

VERSUS

ODEAL PIPPINS LIRETTE

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 13-K-5183-B
HONORABLE A. GERARD CASWELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

AFFIRMED.

Earl B. Taylor
District Attorney
Twenty-Seventh Judicial District
Jennifer M. Ardoin
Assistant District Attorney
P. O. Drawer 1968
Opelousas, LA 70571
(337) 948-0551
COUNSEL FOR APPELLEE:
    State of Louisiana

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Odeal Pippins Lirette**

**PETERS, J.**

The defendant, Odeal Pippins Lirette, appeals her conviction of second degree murder, a violation of La.R.S. 14:30.1. For the following reasons, we affirm the conviction in all respects.

## DISCUSSION OF THE RECORD

It is undisputed that during the early evening hours of November 4, 2013, the defendant shot and killed James Ricky Guillory, Jr. (the victim). A St. Landry Parish Grand Jury indicted her for the offense of second degree murder, and after a two-day trial which began on June 24, 2015, a jury convicted her of the offense. At a November 12, 2015 hearing, the trial court sentenced the defendant to serve life in prison at hard labor, without the benefit of parole, probation, or suspension of sentence. Thereafter, the defendant perfected this appeal, wherein she asserted the following assignments of error:

> 1. The State failed to prove beyond a reasonable doubt that Appellant's actions were not justified to prevent either great bodily harm or death to her by James Ricky Guillory, Jr.
>
> 2. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Appellant, Odeal Pippens [sic] Lirette, committed second degree murder of James Ricky Guillory, Jr.
>
> 3. The trial court erred in denying Appellant's Motion for Post-Verdict Judgment of Acquittal.
>
> 4. The trial court erred in failing to assure that discussions and arguments of counsel made during sidebar discussions were recorded and preserved for appellate review, thereby denying Appellant to her constitutional right to a full appeal.

## OPINION

The defendant asserts in her first three assignments of error that the State of Louisiana (state) either failed to establish that she was not acting in self-defense or that she had the requisite intent necessary to commit second degree murder.

Additionally, in her fourth assignment of error, the defendant asserts that the trial court erred in failing to have all sidebar discussions recorded for appellate review.

The evidentiary record establishes that the offense occurred at a Krotz Springs, Louisiana residence located on rented immovable property, previously belonging to John Wesley Pippins, Sr. (John Sr.), who died in July of 2013. John Sr. and the defendant were formerly husband and wife and although everyone acknowledged that the residence belonged to John Sr. before his death, it was actually titled in the name of their daughter, Penny Wesley Stermer (Penny). At trial, one of the couple's sons, John Wesley Pippins, Jr. (John Jr.), testified that all of John Sr.'s children agreed that despite being titled in Penny's name, the residence actually belonged to the defendant after John Sr.'s death. A mechanic's shop owned by Bobby Guillory separates the residence where the offense occurred and the residence where the defendant was then residing.

At the time of the offense, another one of the couple's children, Brandon Pippins (Brandon), and his friend, the victim, occupied the residence. Brandon moved to the residence from a trailer located in another part of Krotz Springs approximately three months after John Sr.'s death, and one month before the offense. At Brandon's invitation, the victim moved in with him approximately one week after Brandon moved in to the residence. Bobby Guillory testified that after Brandon moved into the residence, he observed that people began frequenting the residence, with the traffic picking up around 4:00 p.m. daily. However, because he closed his mechanic's shop at 5:00 p.m. every day, he did not observe the evening traffic. Additionally, he could not say with certainty that the previous lack of visitor traffic was not primarily because of John Sr.'s poor health and advanced age.

The evidence establishes without question that the defendant did not approve of her son's living arrangements from the moment the victim moved in. According to Brandon, the defendant strongly objected to the victim's presence in the residence and wanted him to be evicted. Bobby Guillory testified that the defendant expressed a concern to him that the increased traffic evidenced illegal drug activity, and asked him to move some of the vehicles around his shop so that she could better see the nature of the activity at the residence.

The evidence also establishes that the defendant appeared at the Krotz Springs Police Department at 7:52 a.m. on November 4, 2013, and asked to speak to an officer about having the victim removed from the residence. When no one was available to speak with her at that early hour, she returned at 4:12 p.m. and spoke with Officer Carl Silvio.

According to Officer Silvio, the defendant "was concerned about someone that was living in her son's home, and wanted to know what [the police] could do about having the subject removed." However, when the defendant told Officer Silvio that the house was titled in her daughter's name, he told her that her daughter "would have to be the one to deal with the subject." Officer Silvio testified that at this point, the defendant began complaining about the excess traffic at the residence, and related her concern that the victim and her son were involved in illegal drug activity and that her son's relationship with the victim "was going to get [him] in trouble." The officer then explained to the defendant that more evidence than excessive automobile traffic was required before the authorities would initiate an investigation. He suggested that she begin to record the license plate numbers of the vehicles frequenting the residence as that might lead to evidence that could be acted upon. According to Officer Silvio, when the defendant finally understood that the Krotz Springs Police would not remove the

victim from the residence without the request of the record owner and/or additional evidence of drug activity, she stated, "I guess I'll have to deal with it myself. Y'all aren't going to help us." At that point, she left Officer Silvio's office.

After leaving Officer Silvio's office, the defendant telephoned Penny and asked Penny to meet her at a local notary public's office to execute the papers necessary to transfer the residence into her (the defendant's) name. Penny met the defendant and executed the necessary documents to complete the transfer. Penny testified that had they been able to find a time prior to this date, she would have executed the documents earlier, and that it was "just coincidental that [November 4] was the particular day that [they] found a notary that was home at the same time that [she] was home." According to Penny, the defendant did not mention her visits to the police department earlier in the day.

At the precise moment she shot the victim, the defendant was on the telephone talking to John Jr. John Jr. initiated the call beginning at 6:21 p.m., and sometime during the initial part of the conversation, the defendant made a comment to the effect that she observed people walking down the levee. A few minutes later, John Jr. set his cellular telephone down for a moment to look for fish bait in his boat, and when he heard the defendant say something that he did not understand, he picked up the telephone and asked her to repeat what she said. The defendant responded by saying that he should "[c]all the police, and tell them to come get these people away from [her] house." The defendant then ceased responding to him although he remained on the telephone line.

At some point thereafter, John Jr. heard the defendant say something like "get out of the house, or get away from the house," and heard a male voice loudly respond with something like: "This is my f****** house, b****." At this point, John Jr. heard the defendant say "don't" with an added comment which he did not

4

understand. He then heard a "pow," at which point he continued to use his cellular telephone to monitor what was going on the other end of the line, while running to his house to look for another telephone to contact the police. As he ran toward his house, he heard another "pow," and heard the same male voice he heard earlier say "you shot me." At this point the call went dead, and he immediately used his cellular telephone to call the police. The police received this call at 6:43 p.m. John Jr. testified that during the entire conversation with him, and during the time that he merely monitored the sounds from the other end of the line, the defendant made no mention of being armed.

Brandon testified that the victim left him a voicemail message that same evening, informing him that the defendant was again complaining about his (the victim's) presence in the residence. A few minutes after he noticed the voicemail, Brandon telephoned the victim and advised him to "go inside and call the current Chief of Police[.]" Brandon heard no background voices as he talked to the victim, but toward the end of the conversation he heard a "pop sound," which he recognized as a gunshot. He then heard the victim say: "Go ahead and kill me, because my mom will kill you." This comment was followed by a second "pop sound," after which Brandon heard the victim say to him, "Your f****** mother just shot me." Brandon stayed on the line for a few moments more, but when he heard nothing else, he hung up and telephoned the police. His call to the police was received at approximately 6:43 p.m., or roughly the same time that John Jr. made his call to the police.

The defendant's reference to people coming toward the residence from the levee referred to the victim and Leah Credeur. They had been walking on the levee that evening, and according to Ms. Credeur, the defendant confronted them as they began walking off the levee toward the residence. Ms. Credeur testified

5

that she observed the defendant speak to the victim, but did not hear most of what was said because she was carrying on a conversation with the victim at the same time. She did testify, however, that she heard the defendant threaten to kill the victim. As the confrontation escalated, the victim instructed Ms. Credeur to go back to the levee, which she did. She testified that while leaving the scene, she observed the defendant walking toward the victim and observed him walking backwards away from her. Shortly thereafter, she heard two gunshots, with a slight delay between the two. She remained on the levee until she saw the flashing lights of approaching police cars.

One of the responders to the scene was Charles Watson, the Chief of the Krotz Springs Fire Department, who responded as an Emergency Medical Technician. According to Chief Watson, when he attempted to check on the defendant to make sure she was not injured, the defendant responded, "[the victim] never got close enough to touch me[.]" Another responder, Krotz Springs Police Officer Joshua Evans, investigated the shooting that evening and brought the defendant to the police station after taking her into custody. According to Officer Evans, when he asked the defendant why she shot the victim, she responded "that her deceased husband, [John Sr.'s] ghost, would not let her sleep, and told her she had to get rid of [the victim]."

Dr. Christopher Tape, a Broussard, Louisiana medical doctor with a specialty in forensic pathology, performed the autopsy on the victim and concluded that he died as a result of a single gunshot wound to the chest. According to Dr. Tape, the bullet entered the victim's body at a slightly downward trajectory, which he described as "very close to being almost straight across, neither upward nor downward." He noted that because he did not know the height and angle from which the gun was fired or the position of the victim, he could not determine the

6

trajectory of the bullet. Additionally, in examining the victim's body, the doctor found no evidence of stippling at the entry wound. He explained that stippling is caused by gunpowder residue burning the skin, but he noted that the clothing worn by the victim would have blocked any stippling. Tissue and blood samples secured for scientific testing revealed negative results for the presence of all drugs tested.

Charles R. Watson, Jr., a forensic scientist with an expertise in firearms examination and gunshot residue, testified that the weapon used in the offense stops depositing gunpowder residue on its target at approximately eighteen to twenty-four inches from the target. Additionally, he found no gunpowder residue on the victim's clothing other than "bullet wipe," which he described as the residue transferred from the projectile as it passes through the clothing.

### Self-Defense Argument

Second degree murder is defined as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1).

Justifiable homicide is defined by La.R.S. 14:20(A), which, in pertinent part, holds that:

> A homicide is justifiable:
>
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
>
> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable

7

person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business, or when committed against a person whom one reasonably believes is attempting to use any unlawful force against a person present in a motor vehicle as defined in R.S. 32:1(40), while committing or attempting to commit a burglary or robbery of such dwelling, business, or motor vehicle.

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

This court in *State v. Alexander*, 04-788, pp. 1-2 (La.App. 3 Cir. 11/17/04),

888 So.2d 401, 402, held:

When reviewing the sufficiency of the evidence, appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and must determine "whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). When a defendant claims that he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that he did *not* act in self-defense. *State v. Brown*, 414 So.2d 726 (La.1982). Defendant argues that the State failed to carry its burden of proof on this issue. Therefore, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that he did *not* act in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985).

This court in *State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d

886, 890, stated the following concerning a defendant's claim of self-defense:

"In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-

8

683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La.11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La.2/6/09), 999 So.2d 769.

While this case must be reviewed under the *Jackson* standard, it is important to note that the case was tried before a jury, making the jury the finder of fact. "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007). Therefore, while we will review all of the evidence presented at trial in the light most favorable to the state, we will not disturb the jury's credibility determinations absent a finding that they are clearly contrary to the evidence.

Much of the defendant's argument that she was acting in self-defense focuses around the fact that she owned the residence she was trying to prevent the victim from entering and occupying. While all of this is true, we further note that the victim was occupying the property with Brandon's permission, and there is no evidence to suggest that the victim knew of the ownership issues arising from John Sr.'s death or that the defendant had any ownership interest in the residence before she confronted him on the evening of November 4, 2013. That being the case, we do not find that the ownership of the residence or the right to be in it is a factor in determining whether the defendant acted in self-defense in this case.

9

The defendant also argues that she felt sufficiently threatened by the victim's aggression to justify her shooting him in self-defense. She bases this argument partly on the fact that the first shot did not hit the victim, and on Brandon's testimony that the victim's personality was to "confront [danger] head on" and not to "turn and run" from danger. She also notes that John Jr. heard her say "don't, don't something" before she fired the first shot, and she suggests that this evidences that she feared for her safety. This argument ignores Ms. Credeur's observation that the defendant appeared to be the aggressor when she last saw her, because the victim was backing away from the confrontation. Additionally, the scientific evidence establishes that the fatal shot was fired at a minimum distance of eighteen to twenty-four inches from the victim. The only evidence that supports the defendant's claim of self-defense is Brandon's testimony that he heard the victim tell his mother that if she killed him his mother would kill her.

Another element of the defendant's self-defense claim is based on the theory that the victim could have been leaning forward at the time of the shooting. She bases this argument on Dr. Tape's finding of a slight downward trajectory of the bullet as it passed through the victim's body. However, we find that this argument ignores the remainder of Dr. Tape's testimony, wherein he clearly stated that he could not determine the trajectory of the bullet based on the information before him, and that in any case, the downward trajectory was so slight that it was "very close to being almost straight across[.]"

The defendant also put forth a theory that the victim had been taking Amitriptyline sometime before the confrontation and that medication could have caused him to be more aggressive. Dr. Tape testified that Amitriptyline is a tricyclic antidepressant, which he did not believe to have a side effect of aggression. Further, the defendant offered no evidence to establish that the victim

10

was taking any medications, with or without a prescription; and no tests were performed in the autopsy process to determine the presence or absence of Amitriptyline in his system at the time of the offense. Additionally, Ms. Credeur testified that she had spent the previous weekend with the victim and did not observe him ingesting any medications.

Applying the *Jackson* standard to the evidence presented, as well as the factors set forth in *Fox*, 184 So.3d 886, we find no error in the jury's conclusion that the state established beyond a reasonable doubt that the defendant did not act in self-defense. Thus, we find no merit in the defendant's first assignment of error.

### *Manslaughter Defense*

The defendant asserts that the state failed to prove that she possessed the requisite specific intent to commit second degree murder, and it failed to prove that there was "insufficient provocation to deprive her of self-control and cool reflection[.]" The defendant argues that she established the mitigating factors of sudden passion and heat of blood by a preponderance of the evidence, which would require that a jury could only find her guilty of manslaughter and not second degree murder.

Louisiana Revised Statutes 14:31, in pertinent part, defines manslaughter as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

The supreme court in *State v. Lombard*, 486 So.2d 106, 110-11 (La.1986) (footnotes omitted) (citations omitted), held that:

11

"[S]udden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict.

This court, in *State v. Jackson*, 14-9, p. 12 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066, held that "[a] reviewing court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury."

The defendant asserts in her brief that the state did not prove that she possessed the requisite specific intent to commit second degree murder. However, the only evidence that she offers to support her claim is the fact that after shooting the victim, she called the police and advised them that she had just shot him, and asked them to send an ambulance because she believed he was dying. The defendant argues that she would not have done this had she intended to kill or cause great bodily harm to the victim.

The defendant's argument ignores the fact that a little over two hours before she shot the victim, she informed Officer Silvio that she would "have to deal" with the problem of the victim's occupancy of the residence herself because the police would not do her bidding; and she then armed herself and confronted the unarmed victim. Additionally, the jury heard Ms. Credeur testify that she heard the defendant threaten to kill the victim.

The defendant's arguments that she acted in "sudden passion or heat of blood" caused by the victim's provocation, which was sufficient to deprive her of her "self-control and cool reflection," are similar to her self-defense arguments.

12

We discussed the circumstances leading up to the shooting at length already and do not find that they are sufficient to prove by a preponderance of the evidence that the defendant was sufficiently provoked so as to deprive her of her "self-control and cool reflection." La.R.S. 14:31(A)(1).

The jury clearly found that the defendant possessed the requisite specific intent for a conviction of second degree murder, and we find no error in that credibility determination. We find no merit in this assignment of error.

### *Motion for Post-Verdict Judgment of Acquittal Argument*

The defendant's motion for a post-verdict judgment of acquittal essentially raises the same arguments that she has raised on appeal, together with an additional argument that the trial court failed to allow relevant evidence into the record that would have shown her state of mind at the time of the incident. The defendant asserts in her motion for post-verdict judgment of acquittal, as well as on appeal, that the trial court wrongly sustained the state's objection to the relevant evidence because the evidence was not part of the "res gestae[.]" The defendant asserts on appeal that had the trial court not sustained the objection, Penny's testimony would have laid the foundation for the admission of the evidence.

We have reviewed Penny's testimony and find no instance where the state objected to any of her testimony on the basis of res gestae. Therefore, this assignment of error is without merit.

### *Recordation of Sidebar Discussions*

In her final assignment of error, the defendant asserts that the trial court deprived her of her constitutional right of appeal due to its failure to ensure that all of the sidebar discussions held during the course of the trial were properly recorded.

The right to a complete record on appeal comes from La.Const. art. 1, § 19, which states:

> No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived. The cost of transcribing the record shall be paid as provided by law.

The requirement that all trial proceedings be recorded comes from La.Code Crim.P. art. 843, which states:

> In felony cases, in cases involving violation of an ordinance enacted pursuant to R.S. 14:143(B), and on motion of the court, the state, or the defendant in other misdemeanor cases tried in a district, parish, or city court, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.

On the issue of the recordation of bench conferences, the supreme court in *State v. Hoffman*, 98-3118, pp. 49-50 (La. 4/11/00), 768 So.2d 542, 586-87, (footnote omitted) (citations omitted), *supplemented*, 00-1609 (La. 6/14/00), 768 So.2d 592, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000), held:

> Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. On the other hand, inconsequential omissions or slight inaccuracies do not require reversal.

> This court has never articulated a *per se* rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I. § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.

14

In *State v. Johnson*, 438 So.2d 1091, 1104, (La.1983), the supreme court held that argument of counsel that is missing from the transcript "is immaterial to an adequate review of the trial court's ruling."

In *State v. Pinion*, 06-2346, pp. 7-8 (La. 10/26/07), 968 So.2d 131, 134-35 (citation omitted), the supreme court held:

> The Court has instead conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal. As a general rule, the failure of the record to reflect the argument of counsel on objections, even when made in open court, does not affect a defendant's appeal because it does not hinder adequate review of the trial court's ruling. Thus, the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant.

In this case, the defendant argues that the trial court's failure to record all of the bench conferences prejudiced her on review. She specifically asserts that the failure to record the one bench conference conducted during the testimony of her daughter Penny prevented the trial court from granting her post-judgment verdict of acquittal. When the trial judge reviewed the trial transcript at the hearing on the motion, it noted that the transcript contained no mention of the evidence the defendant wanted to introduce. The defendant argues that the transcript contained no mention of the evidence because it occurred in an unrecorded bench conference.

Our review of the record reveals that none of the bench conferences were recorded. However, the subject and result of most, if not all of those bench conferences, were either discussed on the record thereafter or were clearly ascertainable by the proceedings that preceded and followed the conferences.

With regard to Penny's testimony, the unrecorded bench conference clearly had as its subject the question of whether she could testify concerning anything her mother had related to her after the commission of the offense. When the trial court

15

returned to the record, it sustained the objection by the state, and the defendant's counsel immediately instructed Penny that "she [could] not say what [her] mother said." The defendant's counsel did not object to this ruling.

Defense counsel's failure to offer evidence at trial that he was in possession of and felt to be relevant may be prejudicial to the defendant. However, it was not the unrecorded bench conferences that caused the defendant prejudice as she indicated in both her motion for post-verdict judgment of acquittal and in the instant appeal. The defendant has failed to show that she was prejudiced by the trial court's failure to record all bench conferences. We find that the bench conferences were immaterial to our review of the record. Therefore, we find no merit in this assignment of error.

## DISPOSITION

For the foregoing reasons, we affirm the defendant's conviction in all respects.

**AFFIRMED.**