NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 19-4

STATE OF LOUISIANA

VERSUS

DEMETRICE DONTRELL WELCH

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 330,770
HONORABLE HARRY FRED RANDOW, DISTRICT JUDGE

**********

BILLY HOWARD EZELL
JUDGE

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.

AFFIRMED.

**J. Phillip Terrell, Jr.**
**9th Judicial District Court District Attorney**
**P. O. Box 7358**
**Alexandria, La 71306-7358**
**(318) 473-6650**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**State of Louisiana**

**Bruce G. Whittaker**
**Louisiana Appellate Project**
**1215 Prytania Street, Suite 332**
**New Orleans, LA 70130**
**(504) 554-8674**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Demetrice Dontrell Welch**

**Catherine L. Davidson**
**Assistant District Attorney, 9**[th] **Judicial District Court**
**P.O. Box 7358**
**Alexandria, LA 71301-7358**
**(318) 473-7338**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**State of Louisiana**

**EZELL, Judge.**

On July 26, 2017, a Rapides Parish grand jury indicted Defendant Demetrice Dontrell Welch for second degree murder, a violation of La.R.S. 14:30.1. The parties conducted the selection of the trial jury on August 28, 2018; said jury began hearing evidence the next day.

On August 30, 2018, the jury found Defendant guilty of the lesser charge, manslaughter, in a responsive verdict. On October 8, 2018, the trial court denied Defendant's motion for post-verdict judgment of acquittal, Defendant waived sentencing delays, and the trial court ordered Defendant to serve twenty years at hard labor.

Defendant now seeks review by this court.

## FACTS

On May 20, 2017, the victim, Elijah Guidry, was a passenger in his cousin's, Corday Taylor's, car. The victim saw Defendant walking nearby and got out of the car when Taylor stopped at a stop sign. The victim and Defendant conversed, apparently in regard to a prior incident when Defendant broke up a fight between two females, one of whom was related to the victim. The victim was displeased with Defendant's intervention and, according to Defendant, threatened violent consequences, such as "shooting up" the home of Defendant's mother. When the victim walked back to the car, Defendant followed him. As the victim moved to either reach into or get back into the car, Defendant shot him.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

# ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Defendant does not deny shooting the victim and thus causing his death. Therefore, justification, i.e., self-defense, is the only issue before this court for review. Defendant cites a number of cases that generally address sufficiency of the evidence and related issues. However, the State quotes a more specific case:

> The defendant's first two assignments of error concern the sufficiency of the evidence. Specifically, the defendant contends that the State failed to disprove his assertion of self-defense and that the State failed to establish that the defendant possessed the necessary intent to kill required for second degree murder or manslaughter. When a defendant raises multiple assignments of error including sufficiency of the evidence, the reviewing court should first address the sufficiency of the evidence. *State v. Hearold*, 603 So.2d 731 (La.1992). In *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86, the supreme court reiterated the standard of review for sufficiency of the evidence claims on appeal, stating:
>
> > The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La. 11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La. 4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*
>
> > Although initially charged with second degree murder, the defendant was convicted of the lesser charge of manslaughter. As relevant herein, manslaughter is defined in La.R.S. 14:31(A) as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.

Second degree murder is defined, in pertinent part, as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A).

> Additionally, the defendant asserted at trial that he was acting in self-defense. Louisiana Revised Statutes 14:20 provides, in pertinent part, that a homicide is justifiable when "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant in a homicide case claims self-defense, the State must establish beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Perkins*, 527 So.2d 48 (La.App. 3 Cir.1988). "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La. 11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

*State v. Fox*, 15-692, pp. 2-4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 889-90, *writ*

*denied*, 16-404 (La. 3/13/17), 216 So.3d 800 (alteration in original).

The core of Defendant's case can be seen in his testimony:

Q. Okay. So Elijah jumps out of the car, um, what does he do at that point?

A. Um, he started walking -- well, I guess, he got back 'cause he had another, he had a white car coming, and he had talked to the white car whatever [sic] and that's when me, the last witness, we kept on walking but he came, him and, uh, Corday Taylor came in, like he got back in the car and they came closer to us and that's when he hopped out of the car, and we started talking about the situation that happened with my little cousin and his little sister.

Q. Okay. Um, was Mr. Guidry visibly upset about that situation?

A. Yes, sir.

Q. What did he tell you?

A. He was like -- 'cause, uh, something had happened I guess, guns was pulled out, and he was like, um, you was clutching a gun or something, um, that morning. I mean, yeah that morning. I was like no, I wasn't. I was just telling them not to fight in front of my house and woot de woot [sic] and, uh, that's when he said, he said all right, uh, stay right there. I'm fixing to come back, and I'm gonna shoot up your house. I pulled up on you so you know I'm with that.

Q. Okay. Um, did you take Mr. Guidry's, uh, statements seriously?

A. Of course.

Q. Did you, uh, consider them threats?

A. Of course.

Q. How long did y'all conversation last about?

A. Um, I say about three to four minutes.

Q. And do you remember how far you two were from the, the vehicle that Mr. Taylor was driving?

A. All right. We like were right here. It was like five feet.

Q. It was, uh, pretty nearby.

A. Yeah.

Q. Um, when Mr. Guidry walks away, what does he tell you?

4

A. He said I'm gonna kill you. I'm gonna shoot up your house. I'm gonna, I'm gonna come get you, and I pulled up on you so you know I'm about that.

Q. Okay. At that time, were you, were you scared?

A. Of course.

Q. Um, did you, um, you believe he -- your life may have been in danger at that point?

A. Of course.

Q. So what do you decide to do?

A. I pulled out my gun which I already hid it. I hid it in my pocket because I was, I was also robbed, um, and a gun pointed to me at gun point [sic], uh, so I took it very seriously, and when he, when he told me that I pulled out the gun and shot.

Q. Okay. Um, did you see how, um, Mr. Guidry was positioned in the, in the vehicle? Like when he was, when he was -- did he open the door or was the door closed?

A. No, the door, the door was already open.

Q. Okay. Uh, when he approached the car, what did he do?

A. He just went to the side like this and when he bent down that's when I shot.

This testimony was generally supported by the testimony of the previous defense witness, Teddius Jones.

The State's main witness was Corday Taylor, the victim's cousin and driver of the car. Taylor described the pertinent events as follows:

Q. And after you turn on Avoyelles, where did you go?

A. We turned right on West Sandy Bayou.

Q. And what happened once you got on West Sandy Bayou?

A. We was coming towards the stop sign at the, where -- at the corner (interrupted)

Q.     Um, hmm.

A.     -- we was coming towards the stop sign.

Q.     Okay. And what happened as you were coming towards the stop sign?

A.     We had a car behind us so we had to make a stop, and he got out of the car [and] said he had to holler at him.

Q.     Okay. Who was the driver of the car that night?

A.     Me.

Q.     Who was your passenger?

A.     My cousin, Elijah Guidry.

Q.     And he told you to stop?

A.     No, I had to stop at the stop sign.

Q.     Okay. And once you stopped at the stop sign what did your cousin, Elijah Guidry, say to you?

A.     He said he had to holler at him. It was -- he was walking up there on (indiscernible) he was walking so he said he had to holler at him.

Q.     So who was walking?

A.     Um, Demetrice.

Q.     And do you see him today in Court? Demetrice Welch? Do you see him today in Court?

A.     No, I don't see him or nothing in here. Oh, right there.

Q.     Could you describe what he's wearing?

A.     A black suit.

Q.     Okay. Did you, um, did you know him before this night?

A.     I know him from my cousin.  He used to hang with my cousin before my cousin moved to Texas like five years ago.

Q.     Okay. And what did you know him as?

A.     Gee, Mimi.

Q.     Okay. And so Elijah Guidry, your cousin, said he wanted to speak with Mimi.

A.     Yes, ma'am.

Q.     And what did Elijah, uh, Guidry do?

A.     He got out of the car, and I turned the car around and put the lights on him 'cause he was going like behind -- 'cause they was walking past the car. So once I turned the car around and put the lights on them, I guess they had their conversation, said what they said. My cousin was coming back in the car, I guess he trailed behind him or whatever he did.

Q.     So let's back up. So they talked?

A.     Yes, ma'am.

Q.     Could you hear what they were saying?

A.     I was in the car.

Q.     Okay. And then you indicated your cousin started walking back towards the vehicle?

A.     Like to come get in the car.

Q.     Did he say anything to you.

A.     No, ma'am.

Q.     When he got to the car (interrupted)

A.     Like he -- by the time he got to the car, he trailed behind him push (interrupted)

Q.     Who is he?

A.     Demetrice. So by the time he tried to get in the car, he was shot three time[s].

Q.     So he walks back -- Guidry walks back to the car.

A.     Yeah, like to get in the car. Like now he's op -- like with the door (interrupted)

Q.     Okay.

7

A.  So we're -- as he facing like to get in the car, he shot from the other side of the door and hit him in the chest three times. That's how I had a bullet hole in the car.

Q.  And who shot?

A.  Demetrice.

Q.  Okay. And what's been marked as State Exhibit two and nine, could you tell me what -- what is that?

A.  That's the car.

Q.  That you were driving?

A.  Yes, ma'am.

Q.  Okay. And what's been marked as nine?

A.  That's the bullet like he shot from the side but that's where the bullet hit (interrupted)

BY THE COURT:

Speak up.  I don't think anybody can hear you.

A.  This is from the side.  This is the side of the car where he got shot at so that's why I got a bullet hole right there so as he was shooting. I guess the bullet hit the car.

Q.  Okay. Now you said he.

A.  Um, hmm.

Q.  Who was shooting?

A.  Demetrice Welch.

Q.  And where was he in reference to this car when he started shooting?

A.  He was on the opposite side of this door. BayBay was on the side of the door like to get in the car so that's how the bullet hole get right there as you see. He was shooting over the door. That's how he was hit in the chest.

Q.  Okay. So your testimony is that Mr. Welch was standing, Demetrice or Mimi, was standing here and he started shooting?

8

A.    Yeah, so he was shooting like over the door.

Q.    Okay.  And so he was here and he shot over the door.

A.    Yeah, like he was standing there like when he pointed.  My cousin, BayBay, ain't even get in the car yet.

Q.    Okay.  Was -- and again, you, you call him BayBay?

A.    Yeah, that's my cousin. That's what we called him.

Q.    And he's also known as Elijah Guidry?

A.    Elijah Guidry.

Q.    Okay.  So when Mimi starts shooting, was your cousin facing Mimi or was he (interrupted)

A.    Facing him.

Q.    Okay. And when the first shot rang out, what did you do?

A.    When the first shot -- it was like I was still in the car. So like after the third shot like that's when I was in shock and it just reacted to me. And then I opened the door.  I got out of the car, jumped the fence, and I didn't know if he was gonna shoot me so I just jumped over the fence.  Came back over to my cousin, picked him up. Me and my cousin full of blood.

Taylor testified there was no gun in the car.  Defendant and Jones both acknowledged that they did not see a gun in the car or in the victim's possession, although both claimed the victim had possessed a firearm in the past. Jones claimed that the victim had pistol-whipped him during a prior robbery.

Although counsels' arguments are not evidence, a passage from defense counsel's closing crystallizes his theory of the case:

Again, Mr. Guidry says he's gonna kill him, shoot up his mom's house, I'm about that and I have something for you.  I don't know what else that means besides I'm about to do something to you. Whether that means he's gonna kill him or just hurt him really bad, either way it's imminent danger -- let me get it right.  The defendant believed he was in danger of losing his life or receiving great bodily harm.  So either way whether it was just a -- whether he was gonna kill him or hurt him -- either way it's justifiable.

9

> Ms. Carter wants you to, wants you to believe that he had to wait for a gun. He had to wait to see a weapon. I tell you if he waited that would have been the last thing he saw -- the gun or the weapon. You can't wait in those situations. Kill or be killed. You can't wait. Sometimes it's split second decisions.

Trial counsel's statements did not correctly reflect the facts and law as they apply in the current case. Even considering that the victim was making threats and Defendant may have subjectively thought the victim was reaching for a weapon in the car, it was not objectively reasonable for Defendant to kill him. The jury could rationally have concluded that there were multiple steps short of homicide that Defendant could have taken. Defendant could have given a verbal warning, fired a "warning shot" not aimed at the victim, or fired a shot to wound the victim. Even if Defendant's fear was viewed as objectively reasonable, the victim in this case did not have to die.

This court has stated: "In cases where the defendant claims self-defense as a justification, the absence of a weapon from the victim's person or immediate reach is often a critical element of the state's proof. The absence of weapon on the victim, however, is not dispositive of the issue." *State v. Griffin*, 06-543, p. 9 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851, *writ denied*, 07-2 (La. 9/14/07), 963 So.2d 995 (quoting *State in the Interest of D.S.*, 29,554, p. 3 (La.App. 2 Cir. 5/7/97), 694 So.2d 565, 567) (citation omitted).

In the current case, even if the record indicated there was a gun in the car, Defendant lacked sufficient justification to kill the victim. The jury could rationally have concluded that the homicide was not necessary to preserve Defendant's life.

For the reasons discussed, Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.