NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

20-432

STATE OF LOUISIANA

VERSUS

BRUCE L. LACHNEY

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 213703-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**********

J. LARRY VIDRINE*
JUDGE

**********

Court composed of Billy H. Ezell, D. Kent Savoie, and J. Larry Vidrine*, Judges.

AFFIRMED, WITH INSTRUCTIONS.

_____

* Honorable J. Larry Vidrine participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Charles A. Riddle, III**
**District Attorney, 12th JDC**
**Anthony F. Salario**
**Assistant District Attorney**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1714**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Bruce L. Lachney**

**VIDRINE, Judge Pro Tempore.**

Defendant, Bruce L. Lachney, was charged with the January 27, 2019 second degree murder of Farrel Graser, a violation of La.R.S. 14:30.1, on April 18, 2019.[1] A jury unanimously found Defendant guilty as charged on January 8, 2020. Defendant filed a motion for new trial on February 10, 2020, on grounds the trial court erroneously denied his motions for continuance and for mistrial. The trial court denied the motion for new trial.

The trial court sentenced Defendant to mandatory life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on February 11, 2020. Defendant now seeks review of his conviction.

## FACTS:

Defendant Bruce L. Lachney, struck the victim, Farrel Graser, with a piece of firewood and killed him.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find one error patent.

We find that the trial court failed to properly advise Defendant of the time limitation for filing an application for post-conviction relief. Louisiana Code of Criminal Procedure Article 930.8 provides the defendant has two years *after the conviction and sentence become final* to seek post-conviction relief. At sentencing, the court informed Defendant that he "has two years within which to apply for post-conviction relief." This advisement was insufficient. As such, we direct the trial

---

[1] The indictment spells the victim's last name "Graser," but the record spells his half-brother's last name "Gracer." The record does not clarify which spelling is correct.

court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to him within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice. *State v. Williams*, 19-718 (La.App. 3 Cir. 5/6/20), 298 So.3d 326, *writ denied*, 20-644 (La. 11/4/20), 303 So.3d 649.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:

Defendant contends the evidence was insufficient to prove beyond a reasonable doubt that he had the specific intent to kill or inflict great bodily harm upon the victim. He also argues the State failed to prove beyond a reasonable doubt that his actions were not justifiable, reasonable, and apparently necessary to prevent a forcible offense against him.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

2

The fact finder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120, 134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 [(2010)](quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (second alteration in original).

"Second degree murder is the killing of a human being. . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1).

The victim's half-brother, Randall Gracer, testified the victim worked for him in his landscape business and was also a retired teacher and a veteran. The victim had no children, and he and his wife divorced after twenty-six years of marriage.

When Detective Michael Cammack of the Avoyelles Parish Sheriff's Office arrived at the scene on January 27, 2019, he found a black Chevrolet pickup truck parked next to the front, right cabin in a group of four structures known as the Brouillette cabins. He saw "a white male subject laying [sic] on the ground in front of the cabin right next to one single tree in the yard." Detective Cammack contacted other detectives to let them know of a possible homicide investigation. Thereafter, Detective Cammack identified several neighbors as witnesses, and he identified the victim as Farrell Gracer. The body was lying beneath the tree facing the road. Detective Cammack also identified Defendant at the scene and saw blood spatter on his face. Defendant was taken to the sheriff's office for an interview.

Detective Cammack photographed the crime scene. One of the photographs showed "a log, piece of fire wood, round firewood that was taken in, it was actually against the tree with blood spatter and large amount of blood in this area[.]"

Photographs of the victim showed him lying on his back with blood around him. A yellow Walmart bag containing raw and cooked deer meat was near the body and "also some deer meat around his head." Detective Cammack also found fried deer meat in the oven inside the victim's cabin. Another photograph showed "a large amount of blood coming from [the victim's] facial area[.]" Detective Cammack observed "the left orbital area and teeth area had an indention from apparent blunt force trauma." He also found a bloodied piece of firewood that apparently was the weapon used to kill the victim. Other photographs showed Defendant's home approximately "a hundred yards maybe due east of the cabin."

Detective Cammack identified other photographs as depicting a bottle of bleach. When he was at the scene in the area of the body, he "smelled the faint scent

4

of bleach." The bottle was "[f]ound in plain view on the back side of the cabin" and had blood splatter on it.

The victim was wearing blue jeans or gray slacks but no shirt. The pants were "kind of pulled down[.]" When Detective Cammack was asked if the victim's "private parts" were exposed, he responded, "I don't think the front part was exposed. Like midways, partial his buttocks that you can see on some of the better pictures there. You can see they were here but I don't think the genitalia was [sic]."

Detective Matthew Shallington took photographs of Defendant on the day of the incident. These depicted Defendant's face with what appeared to be blood on it and the clothing he was wearing when he was apprehended. Defendant's jacket and the bottom of his pants had "[s]pots of what appeared to be blood" on them. Detective Shallington photographed what appeared to be blood on Defendant's right middle finger.

Charles Peavey testified he lived about two hundred yards from the Brouillette Cabins, used mostly by hunters coming to the Lake Ophelia area. Mr. Peavey had lived about a quarter of a mile down the road from Defendant's house, which was down the street and to the right of the cabins, for about five years. Mr. Peavey did not know "anybody was supposed to be living" in the cabins.

On the date of the incident, Jimmy Thibodeaux and his wife, Brenda, stopped at Mr. Peavey's home and "brought it to [Mr. Peavey's] attention that there was something going on at the cabins." Mr. Peavey looked through binoculars and saw a body lying on the ground; Defendant was pouring a bucket of water on it. He watched Defendant go back in the cabin, get another bucket of water, come back out, and pour the water on the victim. Mr. Peavey said Defendant "kind of walked around and then went in the cabin, came out of the cabin with a garbage bag, not

5

aware of what was in the garbage bag, he proceeded to walk across the road, I was thinking back to his house." Police arrived shortly thereafter.

The body of the victim was lying with the head facing away from Mr. Peavey, and he could not tell if the victim was moving. The victim was wearing clothes, but Mr. Peavey "could see his belly was showing at one point." He had "rubber boots or something like that on his feet[.]"

Angela Peavey knew Defendant as a customer at her sister's grocery store and as a resident in the community. She testified Mr. and Mrs. Thibodeaux pulled their truck into the Peaveys' driveway and spoke to them with "urgency." Mrs. Peavey saw Defendant standing over another man who was lying on the ground. Defendant hit the man "a couple of times with a piece of firewood and then ran back into the cabin and there like a lot of binging and banging like you could hear like pots and pans." Defendant came out and poured something on the man's face and body. Through binoculars, Mrs. Peavey saw Defendant kick the man "a couple of times like to nudge him like to almost to wake him up kind of thing." Defendant "went back inside and binged and banged again and then came out with a black garbage bag." When Defendant ran across the street, Mrs. Peavey thought he was going to his house. She told Mrs. Thibodeaux "to relay that to the 911 operator."

Mrs. Peavey never saw the victim move. He appeared to not be wearing a shirt. The last time Mrs. Peavey saw Defendant, he was going across the street with the garbage bag.

Brenda Thibodeaux testified she and her husband, Marion, were going home from their camp through Brouillette on the "[b]eautiful, sunny" day of the incident. As she looked at her cell phone, her husband "suddenly hit the brakes on the truck and stopped the truck in the middle of the road." Mr. Thibodeaux turned the truck

around, and Mrs. Thibodeaux "saw a white male laying [sic] on the ground, his back to the road." The man "looked to be tall and he was heavyset." He was not wearing a shirt, and "his pants were down to his ankles[.]" He was lying on his side, facing the cabins, with his back to Mrs. Thibodeaux.

Mrs. Thibodeaux identified Defendant as the man she saw "[t]hrowing water or some type of liquid onto the gentleman laying [sic] on the ground." Defendant kicked the man on the ground. Mrs. Thibodeaux called 911 and reported "one white male was laying [sic] on the ground and the other white male was kicking him." She described Defendant was kicking the victim "[f]orcefully. He was kicking him like he would have been angry at him not to nudge him to say to get up, not at all."

When the Thibodeauxs pulled into the driveway of the Peavey residence, Mrs. Peavey came outside. They told her about the "altercation taking place across the street." Mrs. Thibodeaux saw Defendant pick up what she "presumed to be a stick or a pipe and start[] hitting the man with that." He was hollering "cuss words" and said "F words." The object in Defendant's hand was "maybe two foot [sic]" in size. Defendant "also had a white jug in his hand and he poured more liquid onto him." He was hitting the victim in the head. Mrs. Thibodeaux never saw the victim move.

After Defendant stopped attacking the victim, Mrs. Thibodeaux saw him go to a nearby truck and dig around in it. He then went into the cabin and "came out with a black trash bag throwed [sic] over his shoulder and you could see that the trash bag was fairly full of whatever he had removed out of the cabin and he crossed the street." The incident took place "within thirty to forty feet from where the truck was." Mrs. Thibodeaux had never seen Defendant or the victim before.

When police arrived, Mrs. Thibodeaux told them she had seen what happened and had called 911. A deputy told her "the gentleman was deceased."

7

Jimmy Thibodeaux testified he saw "a guy laying on the ground and another guy was spraying with the water hose" as he and his wife drove through Brouillette. He turned around and went back to the site but saw only the man on the ground. He turned around once more, and "the guy was there again[,]" kicking the man on the ground. Mr. Thibodeaux identified Defendant as the man kicking the other man "in the sides." Mr. Thibodeaux pulled in at the home of the Peaveys.

While the Thibodeauxs were at the Peaveys' home, Mr. Thibodeaux observed Defendant hitting the victim with a piece of firewood, about two feet long, at least once. The victim was lying down, positioned to Defendant's right side, between Defendant and the cabins. Mr. Thibodeaux did not view the situation through binoculars.

As Defendant kicked the victim, Mr. Thibodeaux could hear "some cussing going on" from Defendant. Mr. Thibodeaux saw Defendant go back into the cabin and come out with a gallon jug of something he poured on the victim. Defendant next "went back into the pickup truck, he was digging into the pickup truck, then he went back into the cabin and you could hear a bunch of screaming, whatever going on and a bunch of noise." Defendant "then come [sic] out the cabin with a trash bag over his shoulder, walked to [the victim], kicked him and left out." Mr. Thibodeaux remained at the Peaveys' property until police arrived, and he never saw the victim move.

The victim was wearing pants of "a brown tan color" and no shirt. Mr. Thibodeaux thought the victim's pants were "a little low, I don't know if they was [sic] quite all the way to his knees but they was [sic] not in normal position." The pants were low enough to show the victim's private parts.

Brittany Dauzat lived across the street and "a little to the side" from the Brouillette cabins. She could see the cabins from the front of her house. She had seen Defendant and the victim prior to this incident, but she did not personally know either one.

On the day of the incident, Ms. Dauzat was in her front yard when she heard Defendant "hollering and cursing." She ran to the end of her driveway and saw Defendant and "something on the ground that looked like a bag at the time[.]" Ms. Dauzat saw Defendant standing over it, "hitting it with [what] looked like a pole" more than once. The object did not move.

Ms. Dauzat saw Defendant walk to the cabin, bring out a hose, and spray the object. Defendant returned to the cabin. When he came back out, he looked across the street. Ms. Dauzat realized Defendant noticed her, "and he took off[.]" She ran toward her house, afraid Defendant had seen her. She "could tell from the hollering and stuff he was mad or whatever and just the way he was standing there, I didn't know what to expect so I just ran to my house." She did not call 911 because she did not realize the object on the ground was a person. When police arrived, Ms. Dauzat went outside and told them what she had seen.

Defendant testified at trial after the trial court informed him of his right not to take the witness stand. He told the jury he had lived in the Brouillette Community "[s]ince [he] was born." He was sixty-one years old at the time of trial. He testified he went to the seventh and eighth grades in "Special Ed" in Marksville. He also said he attended "middle school and I think one year at high school or a half a year."

Prior to this incident, Defendant owned a house with his brothers, but it was damaged. Defendant lived "[a]t the little cabin" with the victim and "was helping him out a lot." Defendant took care of him, cleaning the cabin and washing clothes.

9

Defendant said the victim would "urinate in bottles and I had to thro[w] that away, clean all that." Defendant lived with the victim for a total of "at least a year and a half"; he later testified he lived with the victim off and on for about three years.

When asked to describe his relationship with the victim, Defendant said, "I don't listen to him and whether he tells me and it was the only place I had to live. Abused me, rape [sic] me a couple of times you could say." The victim "[p]ut his hands on me trying to rape me, have sex." This happened "[p]retty often when he started drinking[.]" When asked whether this happened more than one time, Defendant stated, "[c]ouple when I'd fall asleep, pass out myself you know, he was on me." The victim put his hands on Defendant "at least three times a week[.]"

Although Defendant admitted he was in a relationship with the victim, he testified he did not want to be. The victim would get "kind of mean, get mean and violent" when he drank, and that was "when he wanted to have sex mostly." When asked if he wanted to do that, Defendant replied, "No, not really, no." He stated he did not want that kind of relationship with the victim, but he "didn't have no [sic] choice." He said he "didn't have no [sic] other place to go." He testified, "I have family but they wouldn't help me, they didn't they were always with their kids and all of that. They had the hands full. They'd always tell me and they couldn't help me." Defendant and the victim each had his own money. Defendant gave the victim his Federal Express debit card to hold for him to "make sure I don't spend more than what I was supposed to."

Although Defendant was scared of the victim, he never called police because "I just don't like to get involved with the law." Defendant's criminal history included "Simple Burglary, and lot of misdemeanors." He thought he might have

"at least three or four felonies I guess three or something, I don't know." None of the crimes were violent.

Defendant had recently been in jail for simple burglary at the time of this incident, and the victim helped him get out. When Defendant left jail, he "went straight to [the victim] and slept there that night." Defendant testified he could live where he wanted and come and go to his own house. However, he said the victim "didn't want me to live anywhere[,]" and "most of the time he didn't want me to work[.]" Defendant said he was really discouraged about his own house and had no other place to stay. He was always scared of the victim.

The victim would get mad if Defendant went to the house of their friend, Anthony Gagnard. Defendant said he would "just start walking on the road" when he could get away from the victim.

The victim had to force Defendant to have sex with him; Defendant "didn't feel comfortable." Defendant would try to get out, but the victim would "get on me and I couldn't move." When asked if he ever tried to leave, Defendant said, "I couldn't." Defendant left at one point but came back to live with the victim who would "[s]weet talk" him.

Defendant said the victim "drank too much." Defendant would fall asleep in the back of the truck and could not keep up with the victim. On the day of the incident, Defendant and the victim were sitting in the truck with a skinned deer in the back of it. They were supposed to have gone fishing, and they were drinking vodka. Defendant testified:

> I was drinking that day. I drank a few beers and I don't know it just it was kind of making me sick like I don't know. He told me to fix . . . I fixed a drink. And looks like I felt better. And we ran out, we come into town and he got him another half gallon and went back.

11

Their friend Mr. Gagnard was with them.

Mr. Gagnard had "a little square board" with a hole in it. He was going to patch the hole. Defendant and the victim were sitting in the truck as Mr. Gagnard got mad and "said ya'll [sic] playing with me." Mr. Gagnard "cursed a little bit and said something and he went back home."

As Defendant and the victim continued to sit in the truck, Defendant said the victim "was begging me to do something I guess in back of the truck." Defendant dropped his drink when he sat down on the back of the truck, and the victim told him to fix himself another one. Defendant went to the cabin.

Defendant fixed his drink, and he and the victim "sat down and we talking [sic]." He testified, "And I told him he wanted me to go shot and I said as long as you don't rush me." His testimony continued, "And so I (UNTELLIGIBLE) talking about sex and all, putting his hands on me. When I had enough I was going back home (UNTELLIGIBLE) . . . back to my own house you know." Defendant was upset because the victim was talking to him about sex. He testified:

> I was walking and I felt like somebody pulled my arm. He had me by the arm and he had a piece of his firewood was right here. It was something, some other stuff too; firewood and attacked me and you know. I hollered . . . I was way smaller than I am now. How I . . . I still don't know, got the piece of wood and I hit him before he hit me.

After Defendant grabbed the firewood, the victim "was on the ground and [Defendant] tried to get him up, but he wouldn't move." After Defendant hit the victim, he "just left him down." He "tried to bludge [sic]" the victim to "see if he would get up." He denied pouring water on the victim or spraying him with a water hose. Defendant admitted at trial he hit the victim over the head, and the victim fell. He denied hitting the victim more than once, and he denied hitting the victim after

12

he was on the ground.  He also denied kicking the victim; rather, he "[j]ust put my hand on him and tried to shake him."

Defendant "took off running" because he "got scared."  He testified, "I'm scared of a dead body[,] me."  Nevertheless, Defendant testified he did not know the victim was dead when he left the scene.  He said he "probably went back in the camper, got me some clothes and I left."  He did not know if the witnesses who testified were "telling the truth or not[,]" but he said, "I wish they would have seen what happened before.  I don't understand why they didn't see that."  Defendant did not know how the raw and cooked deer meat got on the ground on the victim's head, and he never saw it.  He said they had a skinned deer in the back of the truck.

Later in his testimony, Defendant admitted he could have simply walked away, but he said the victim "had me by the arm still."  Defendant then said for the first time the victim also had a log after Defendant got the first one away from him.  He testified, "it had like six pieces of wood on the ground[,]" and both of them each had a piece of wood.  Specifically, Defendant testified:

> Q.    O.K.  before you hit him with the log and put him on his back, you had gotten the log away from him, right?
>
> A.    Yes, sir.
>
> Q.    He didn't have a log, right?
>
> A.    Oh yeah he had a log, he was fixing to . . . it wasn't the first time he was . . .
>
> Q.    I'm talking about this time, Mr. Lachney.  Did he have a log in his hand when you took the log from him?
>
> A.    I couldn't have too[k] [sic] the log from him.  He had the piece of wood . . . we had each a piece of wood.
>
>        . . . .
>
> A.    I know I took the log away from him after he was on the ground.

Q. You took the log away from him after he was on the ground?

A. I moved it out the way.

When asked yet again about the sequence of events, Defendant testified, "We both had each a weapon in our hands. I mean each a log." He said, "He . . . each swung . . . he swung at me, he missed me and I hit him." Defendant admitted he could have left the scene and walked away, but then he said, "It was him or me to go down." Defendant was trying to go home, and he was heading in the direction of his house. He said he hit the victim "[t]o save me . . . to save myself" because "he was coming after me. I mean putting his hands on me. Fight or what's that word hitting me, you know."

Defendant testified he feared for his life as the victim was attacking him. He said, "Before it seemed like we were just getting along, nothing was happening. And he started his little game."

Defendant did not tell investigating officers the victim grabbed him, and he got the log from the victim and hit him. He was asked, "And you didn't tell any of this to the officers, did you?" Defendant responded:

No, sir because I know what he did to me and all that, you could see, I didn't have to tell them, that's the way I looked at it, they could just see the picture, see . . . just see really could see and picture it and tell what happened. You know, without me having to tell them.

Defendant walked away "[w]ith fear" and left after the victim was on the ground; he "didn't know if he was knocked out or what." He denied cursing as witnesses had testified because the victim "was knocked out," and there "[w]asn't [sic] no reason." Defendant was not mad at the time, he "was just scared."

The trial court accepted Dr. Christopher Tape as an expert in forensic pathology. He performed an autopsy of the victim on January 28, 2019. The victim

14

had a crushing injury to the left face, including the left orbit (bones around the eye), cheek, and ear, that "was caused by something that is roughly odd size." The victim also had underlying lacerations to the left side of his face and a laceration on the right side of his head from blunt force injury. When asked whether "something more than just a fist" may have caused the injury on the right side, Dr. Tape testified, "a fist could be part of this but overall you're not going to get this type of crushing injury not with a single fist for sure." He believed "[t]he crushing injury could have been caused by one blow" to the left eye area. Not all of the injuries were caused by that one blow, but they all appeared to be caused by one object.

Dr. Tape explained how orbital crushing can cause fractures to the sinuses that cause blood to drain into the airways and into the lungs. He found the victim had "hyper inflated lungs with blood in the airways." Dr. Tape testified the mechanism of the victim's death was drowning due to facial fractures as a result of blunt force trauma.

Dr. Tape did not find any brain injury or skull fractures during the autopsy. The victim's injuries were "consistent or confined to the face" with blood in the airways. Dr. Tape also found "small little tears, lacerations" on the victim's shoulder and upper chest area. When asked if those lacerations could be defensive wounds, Dr. Tape responded, "Almost anything could be a defensive wound in the right circumstances perhaps."

Toxicology reports showed the victim had amphetamine and alcohol in his system. Dr. Tape had no way to know whether the amphetamine was a prescribed medication. The amphetamine level of the victim was "340 nana grams per milliliter," a "higher than therapeutic levels [sic] but lower than a chronic user's

levels." The victim's blood alcohol level was 0.148, a level that would make the victim legally too intoxicated to drive.

Louisiana Revised Statutes 14:20(A)(1) states, "A homicide is justifiable . . . [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."

> When a defendant in a homicide case claims self-defense, the State must establish beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Perkins,* 527 So.2d 48 (La.App. 3 Cir.1988). "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes,* 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied,* 15-178, 15-220 (La.11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas,* 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied,* 08-1276 (La.2/6/09), 999 So.2d 769.

*State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La. 3/13/17), 216 So.3d 800.

Defendant denied hitting or kicking the victim more than once or after he was on the ground. He testified he did not curse at the victim, and he had no reason to do so after the victim was "knocked out." Although Defendant claimed he and the victim both held a piece of firewood as they fought, investigating officers found only one piece of firewood at the scene, and it was covered in the victim's blood. Accordingly, we find that the State effectively challenged Defendant's credibility with the witnesses' testimony.

The State also established the inconsistency of Defendant's testimony. According to Defendant, the victim abused him and raped him a couple of times. However, Defendant also said the victim often put his hands on him and tried to rape him; then he said it was a couple of times, and then he said it was at least three times a week. Although Defendant was afraid of the victim and did not want to have sex with him, he never called police. He felt he had no choice about his relationship with the victim, but he also said he could come and go as he pleased. He said he could not leave, but he also testified that he left once, and the victim "sweet-talked" him into coming back. Although Defendant said he could not live in his own house, that was where he was headed after the confrontation with the victim.

Given the presence of only one piece of firewood suggests one of two scenarios. In the first, the victim could have come at Defendant with the firewood, and Defendant could have wrested it from him and inflicted the fatal blow to the left side of the victim's head. In the second, Defendant could have picked up the piece of firewood and struck the unarmed victim. In either scenario, the victim was unarmed when Defendant struck him with sufficient force to crush the side of the victim's head. Dr. Tape's testimony shows Defendant struck the victim with the firewood again on the right side of the victim's face. Although none of the witnesses saw what happened between Defendant and the victim prior to the victim being on the ground, direct testimony shows Defendant kicked the victim forcefully after he was on the ground, struck the victim repeatedly with something, and poured something on the victim. Defendant went into the cabin, packed a black trash bag with something, and left the scene without checking on the victim or notifying authorities.

Only Defendant's unclear and confusing testimony suggests the victim may have attacked him, and he responded to protect himself. However, even if the victim was armed with the piece of firewood at some point in the encounter with Defendant, he was disarmed, intoxicated, and unable to defend himself when Defendant struck him with the crushing blow. Further, the victim was clearly not a threat to Defendant when Defendant continued to kick and beat him after he was on the ground. Regardless of whether Defendant was trying to protect himself from a forced sexual attack and possible bodily harm, the perceived danger was no longer present once he disarmed the victim. Thus, the excessive force Defendant used against the victim, whether from the onset of the encounter or from the point where Defendant disarmed the victim, was unnecessary and defeats his claim of self defense.

Further, once Defendant disarmed the victim, he struck him with sufficient force to crush the left side of his face and cause so much blood to flow into the victim's airways that he drowned. He continued to beat the victim on the ground and poured a liquid, possibly bleach, on him. Defendant's actions sufficiently show he intended to kill or cause great bodily harm to the victim. As such, we find that the evidence was sufficient to support the jury's verdict.

**ASSIGNMENT OF ERROR NUMBER THREE:**

Defendant alleges the trial court erred in denying his motion to continue the trial and thereby denied him of his constitutional right to a fair trial. He received a notice from the State pursuant to *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527 (2009), on January 6, 2020, the afternoon before trial. The notice stated it was:

> hereby provided to defendant through CHAD GUILLOT, counsel of record, in writing at least forty-five (45) days in advance of trial for the purpose of objection or stipulation, in conformance with *Melendez-*

18

> *Diaz v. Massachusetts*, 129 S.Ct. 2527 and Section 501 of Title 15 of the Louisiana Revised Statutes, that the defendant provide written notice to the Court no later than thirty (30) days from the date of receipt of this notice whether (A) the defendant seeks to exercise the Confrontation Clause right to object to the use of the certificate(s) and require the court to subpoena the person(s) who performed the examination or (B) the defendant stipulates to the use of the certificate(s) as prima facie proof of contents and proper custody of the said evidence from the time of delivery to the laboratory until the time of its removal for transport to court.

The notice pertained to the results of DNA analysis. The trial judge signed an order requiring Defendant to respond according to the notice within thirty days on January 6, 2020. However, trial started the next day, January 7, 2020.

The "notice-and-demand" statute, La.R.S. 15:501, required the State to give written notice of its intent to use the proof by certificate "not less than forty-five days prior to the commencement of the trial[.]" The State did not do that. Defense counsel asked the trial court for a continuance "based on the evidence just being given to me and based on other conversations we had today with troubles with [Defendant.]" Counsel did not know at that point whether he would need to hire his own DNA expert based on the report. However, the State agreed not to use the DNA evidence if the case proceeded to trial that week as scheduled. Defense counsel objected, pondering "what if I want to use [the evidence] and I don't have the chance to use it because I haven't had the chance to review[?]" The trial court denied Defendant's motion to continue, and the trial began the next day.

At the February 10, 2020 hearing of Defendant's motion for new trial, counsel argued:

> The problem wasn't the results [of the DNA testing], the problem was my defense . . . part of my defense was the day before trial was that there was a lack of evidence here. Part of it is they didn't test things, which they hadn't up to that point. They gave it to me the day before trial, I have to start redoing my theory of the defense.

19

Defense counsel erroneously argued the results of the DNA analysis showed the piece of firewood contained the victim's blood and also Defendant's DNA and would have been detrimental to the part of his defense pertaining to lack of evidence. In fact, the DNA analysis identified "Exhibit 5" as "one swab of suspected blood from the fire wood[,]" and the report stated, "The DNA profile obtained from the swab of suspected blood from the fire wood was consistent with the DNA profile obtained from the reference sample from [the victim]."[2] The analysis revealed no presence of Defendant's DNA on any of the samples other than Defendant's reference swab.

Counsel did not know how that could have helped the defense, but he explained:

> [S]ometimes more evidence helps in plea negotiations as well, which I know for trial purposes that's different. But sometimes less evidence forces us to trial because we don't have enough evidence and then the day before trial we get all this evidence and whoops, we could have done this or that, we didn't know so. That's the only reason really it could possibly prejudice us would be for that.

In this appeal, Defendant contends the evidence caused him to change his defense and would have been beneficial to him during plea negotiations. At trial, during a conference with the trial court out of the presence of the jury, defense counsel noted the State had made a plea offer to Defendant of manslaughter with a twenty-five-year sentence. The trial court had approved that offer at the time. Defendant rejected that offer prior to trial.

The report indicated the DNA examination was completed on March 14, 2019, and the report was released on March 25, 2019, showing the DNA analysis for items

---

[2]The "evidence submitted" for analysis stated "Exhibit #0001-05" was "[t]wo swabs of suspected blood from fire wood[.]" However, the "results and conclusions" addressed only "one swab of suspected blood from the fire wood (Exhibit 5)[.]"

found at the crime scene. Specifically, the report showed DNA analysis results from the victim's fingernail clippings, blood swabs taken from the piece of firewood, blood stains from Defendant's jacket, and reference samples from Defendant and the victim. Apparently, the report could have been furnished to Defendant long before the day prior to trial. The State gave no reason for its last-minute disclosure.

Louisiana Code of Criminal Procedure Article 712 provides a timely-filed motion for continuance may be granted within the trial court's discretion upon a showing of a good ground. The denial of a motion to continue shall not be reversed absent an abuse of that discretion. *State v. McPhate*, 393 So.2d 718 (La.1981) (citing *State v. Hammontree*, 363 So.2d 1364 (La.1978); *State v. Lukefahr*, 363 So.2d 661 (La.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790 (1979)).

In *McPhate*, 393 So.2d 718, on the day before trial, the State learned of an inculpatory statement the defendant made. The State's attorney immediately notified defense counsel. The trial court denied the defendant's motion for a continuance, and the defendant pled guilty but reserved his right to appeal the denial of the motion. The supreme court held the defendant failed to show, either in the motion or on appeal, that any specific prejudice resulted from the late discovery of the evidence. The defendant did not indicate "what defense, if any, could have been set forth if additional time had been granted." *Id.* at 721. Accordingly, the supreme court could not "conclude that the trial judge abused his discretion, nor that defendant was so prejudiced by the denial as to require a reversal of the conviction." *Id.*

Likewise, Defendant here has not shown prejudice resulting from the late notification of the DNA analysis. Although he claims the information may have changed his defense, he does not explain how it would. Indeed, at the hearing of the

21

motion for new trial, he stated, "I don't know if it would help me or not, I don't know." Counsel argued he had built his defense around a lack of evidence, and this information made him reconsider everything. However, the State did not use the DNA analysis at the trial. Thus, Defendant was in the same position at trial without the evidence going to the jury as he was prior to the disclosure of the report. Further, the analysis showed nothing the jury could find exculpatory; it only verified the victim's beating with the firewood and showed Defendant was sufficiently close to the beating to be splattered with the victim's blood. If anything, the evidence bolstered the State's case.

Regarding Defendant's claim that the information may have influenced him during the plea negotiations, he has failed to identify any such possible influence. At the hearing of the motion for new trial, defense counsel argued "sometimes less evidence forces us to trial because we don't have enough evidence," but he has failed to show how having more evidence, *i.e.*, the DNA analysis, would have convinced him to accept the plea offer.

Accordingly, we find that the trial court did not abuse its discretion when it denied Defendant's motion to continue the trial based on the DNA evidence given to Defendant the day before the trial.

**ASSIGNMENT OF ERROR NUMBER FOUR:**

Defendant argues the trial court erroneously denied his motion for mistrial based on prejudicial statements of a prospective juror in the presence of the jury venire that denied him his constitutional right to a fair trial. He contends the trial court erroneously continued questioning the witness in front of the entire jury venire instead of speaking to the witness privately, and the trial court's subsequent admonishment tainted the entire venire.

22

Louisiana Code of Criminal Procedure Article 771 provides, in pertinent part:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> . . . .
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official . . . .
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Louisiana Code of Criminal Procedure Article 775 states, in pertinent part, "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial[.]" However, mistrial "is a drastic remedy, and except in circumstances in which the mistrial is mandatory, 'is warranted only when a trial court error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial.'" *State v. Andrews*, 19-68, p. 1 (La. 1/14/19), 260 So.3d 1202, 1202 (citing *State v. Harris*, 00-3459, pp. 8-9 (La. 2/26/02), 812 So.2d 612, 617).

> A trial court need not order a new trial absent a showing that comments made by a prospective juror affected other jurors or prejudiced the defendant. [*State v.*] *Carmouche*, [01-405 (La. 5/14/02), 872 So.2d 1020]; *State v. Cushenberry*, 407 So.2d 700 (La.1981); *State v. Hutto*, 349 So.2d 318, 320 (La.1977). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.

*State v. Richard*, 19-910, p. 18 (La.App. 3 Cir. 6/3/20), 298 So.3d 862, 871, *writ denied*, 21-194 (La. 5/4/21), 315 So.3d 223.

During voir dire, potential juror, Sam Blanchard, told the trial court he read about this incident in the newspaper. His comment led to this conversation:

BY THE COURT:

And do you remember what you read without telling me what you read?

BY MR. BLANCHARD:

I remember he beat that fellow up, killed him basically for no reason.

BY THE COURT:

That's what the article said?

BY MR. BLANCHARD:

That's what the article said.

BY THE COURT:

Now you understand that is newspapers, that's not evidence?

BY MR. BLANCHARD:

That's right, I understand.

BY THE COURT:

So could you serve as a juror … the law says the State through the assistant district attorneys have to present evidence to convince you beyond a reasonable doubt that Mr. Lachney committed the offense. He doesn't have to do a thing, he doesn't have to say a word, he doesn't have to question witnesses, he doesn't have to call witnesses. The burden of proof is entirely on the State to bring evidence through witnesses or exhibits to convince you beyond a reasonable doubt. Can you put that article out of your mind Mr. Blanchard and say well I know what the article said and but there's got to be evidence to convince me because I can tell you for one everything I read in the newspaper isn't true. Can you do that, and if you can't that's fair. But we got to know can you judge the case simply on the evidence and block out anything that you recall…

BY MR. BLANCHARD:

I say no.

BY THE COURT:

That's fair and the attorneys will question, that's why you're here to tell the truth so we can see you might be a great juror in another case and not so good in this one, and that's not a slam to you, that's just how life is. Anybody else hear or read anything about this case?

Later during *voir dire*, the State's attorney questioned Mr. Blanchard:

You said and I don't want you to say it again, but you said that you saw and read in the newspaper. And now they have it on Facebook, and online, anybody else remember seeing it? Might have been on KALB, anything like that. You understand that and everybody understands that the only evidence that you are to consider is evidence presented right there on that chair. Knowing that, would you still have a difficulty sitting on this case if you had to?

BY MR. BLANCHARD:

I've got a problem with somebody you know killing somebody.

BY MR. SALARIO:

Right, but you don't know that, that's a newspaper. The only evidence is right here.

BY MR. BLANCHARD:

Right, okay.

BY MR. SALARIO:

Would you be able or not really?

BY MR. BLANCHARD:

I think I could do it.

BY MR. SALARIO:

Because newspapers. . . national media gets it all the. . . get's [sic] it wrong all the time. You understand, it's not. . . because they don't have privy to everything else, the investigation and so forth.

BY MR. BLANCHARD:

Correct.

Defendant moved for a mistrial at the break after that portion of the voir dire. He argued "the entire jury pool heard that." He did not "believe an admonishment would help or be able to prevent the bias or prejudice that happened from that[.]" In his appeal brief, Defendant complains that Mr. Blanchard was allowed to continue his comments in front of the venire instead of being questioned individually. However, defense counsel made no attempt to stop the continuation of Mr. Blanchard's comments or request that further questioning be made individually. Instead, he waited until the trial court and the State's counsel finished that line of questioning of Mr. Blanchard, questioned several others in the venire, returned to Mr. Blanchard on another line of questions, and then questioned a number of individuals in the venire himself. Defense counsel even questioned Mr. Blanchard about where he learned his news about the case. Only after a significant time later, during a break and after the questioning of that potential jury panel ended, did counsel move for a mistrial based on Mr. Blanchard's comments that counsel had made no attempt stop. At that point, the opportunity to question Mr. Blanchard individually, as Defendant's brief suggests should have been done, had long passed. Any perceived damage that Defendant now believes may have been averted had not been brought to the trial court's attention at the proper time.

Nevertheless, Defendant still moved for a mistrial based on Mr. Blanchard's comments about what he read about the case. After the trial court denied that motion, finding the situation did "not create a legal defect under Article 775," it granted defense counsel's request for an admonishment to the jury to disregard Mr. Blanchard's comments. The trial court told the jury:

> You heard earlier Mr. Blanchard a prospective juror talk about something he read in the newspaper about this case and because he read it in the newspaper he formed an opinion. I admonish you that you are

to disregard what Mr. Blanchard said. And the same for any of you who remember or read something about this case in the newspaper. Newspapers are not trials, newspapers are not evidence so you're to disregard that.

Curiously, Defendant's brief complains that "the court did not offer the opportunity to question the jury venire about whether Mr. Blanchard's repeated comments about [Defendant's] guilt prejudiced them." However, the brief then states, "[t]o have questioned the prospective jurors about whether they had heard the comments and whether the comments prejudiced them in anyway [sic] would have unduly highlighted the fact of what the newspaper purportedly reported." Thus, Defendant seemingly argues that the trial court did not do something he believes would have been detrimental had it done it.

Defense counsel asked for a mistrial because he did not "believe an admonishment would help or be able to prevent the bias or prejudice that happened from that . . . ." Defendant's brief notes that his counsel requested the admonition even though "it would again put before the venire the fact that the newspaper reported that [Defendant] killed the deceased." Counsel requested the admonishment because he had read an unidentified case "awhile back . . . that if the defendant did not ask for an admonishment he was basically waiving that . . . in other words they asked for a mistrial which was denied . . . [.]"

In *Richard*, 298 So.3d 862, a prospective juror stated during voir dire that she knew the defendant through her employment at an immigration facility that also housed Department of Corrections inmates. During a conference in the judge's chambers, she said she could not be impartial. The trial court granted a challenge for cause and released her. The defendant moved for a mistrial and argued an

admonition to the jury to disregard the comment would only call attention to what was said.

The trial court denied the motion and admonished the jury venire according to La.Code Crim.P. art. 771. The trial court also "reiterated that a defendant cannot be convicted unless the State proves each and every element of the crime beyond a reasonable doubt and that the jury must apply the law as the instructed." *Richard*, 298 so.3d at 870. The other prospective jurors indicated they could accept those rules.

We find that the proper action here, since defense counsel disapproved of the questioning of Mr. Blanchard taking place in front of the entire venire, would have been a timely objection by counsel to ask for the questioning to continue in private. Counsel did not make that objection.

Therefore, we find that the trial court acted in accordance with La.Code Crim.P. art. 771. Defense counsel requested an admonition, the trial court gave it, and the trial court denied the motion for mistrial because it was satisfied the admonition was sufficient. It was within the trial court's discretion to do so, and Defendant has failed to show an abuse of that discretion.

## **DECREE:**

Defendant's conviction and sentence are affirmed. Further, we direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED, WITH INSTRUCTIONS.**